UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOY M.,

                        Plaintiff,

                                                    **DECISION AND ORDER**
        v.                                          23-CV-601-A

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

## I.    INTRODUCTION

Plaintiff Joy M., represented by counsel, brings this action against the Commissioner of Social Security (hereinafter the "Commissioner"), seeking review of the Commissioner's determination denying Plaintiff disability insurance benefits ("DIB") under the Social Security Act (the "Act"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).  Before the Court are Plaintiff's (Dkt. 8) and the Commissioner's (Dkt. 9) cross-motions for judgment on the pleadings, and Plaintiff's reply (Dkt. 10). For the reasons set forth below, the Plaintiff's motion is **DENIED**, and the Commissioner's motion is **GRANTED**.

### A.  Procedural History

On January 15, 2021, Plaintiff filed an application for Title II period of disability and disability insurance benefits going back to 2013. T.101, 228.[1]  Plaintiff was born

---

[1] References herein preceded by "T" are to consecutively paginated, Bates-stamped pages within the administrative transcript of official proceedings in this case. Dkt. 5.

on October 2, 1985, and she was a younger individual during the relevant period. T. 30, 86. After filing her application, Plaintiff, in June 2022, amended her alleged onset date to allege disability beginning on July 3, 2019. [2]

Her claim was denied initially on May 4, 2021, and upon reconsideration on October 7, 2021. Thereafter, at Plaintiff's request, a hearing held on June 30, 2022, before Administrative Law Judge ("ALJ") Timothy Belford. T. 40-85. Plaintiff, who was represented by an attorney, appeared and testified at that hearing, as did a vocational expert. *Id*.   On September 13, 2022, the ALJ issued an unfavorable decision. T. 15-36. That decision became final on April 28, 2023, when the Appeals Council denied Plaintiff's request for review.  T. 1-7.  This action ensued.

### B.  The Administrative Record

#### 1.  Plaintiff's Physical Health

From September to January 2014, Plaintiff underwent magnetic resonance imaging (MRI) studies and attended neurosurgical consultations at University of Buffalo Neurosurgery (UBNS) in connection with complaints of headaches and paresthesia.  T. 412-28.  She also reported experiencing mild and "very tolerable" neck pain. T. 427.  Her headaches were worse when she was very stressed, and

---

[2] In connection with application, Plaintiff originally alleged that she became unable to work on September 29, 2013. T. 228. She indicated that she worked as a home health aside until April 2014 and that, after that date, she worked part-time for five years doing newspaper delivery, which overlapped with some part-time work as a Door Dash delivery driver. T. 252, 260-61, 288, 332. At her hearing in June 2022, Plaintiff amended her alleged onset date to July 3, 2019. T. 44. She reported that, "on and off," she was still working for Door Dash. T. 48.

she reported having a stressful life due to having many kids, relationship troubles, working as a nurse's aide, and being extremely busy. T. 421. Following two examinations and a review of imaging results, which revealed a Chiari malformation, UBNS nurse practitioner (NP) Kevin Cuddahee assessed that Plaintiff was "neurologically nonfocal on her examination without any acute findings." T. 428. Plaintiff's "par[e]sthesia[] have been mild and tolerable certainly not progressive." T. 428. He advised that a Chiari decompression procedure could be considered if Plaintiff's neck pain and headache symptoms failed to respond to medical management, but not before then "as she remains neurologically nonfocal." T. 428.

In 2018, Plaintiff continued to report headaches and neck pain symptoms, which were treated by medications and quarterly injections. T. 563-617. During neurological follow-up at DENT Neurologic Institute (DENT) in November 2018, Plaintiff reported three to four headaches weekly, while she experienced ongoing stressors from financial concerns and her six children. T. 586. She reported having to "wake up early in the morning to do a paper route." T. 586.

In February 2019, Plaintiff's primary care provider Dr. Annemarie Laurri, "[e]couraged [her] to engage in some kind of regular physical activity."  T. 594.

On July 3, 2019, Plaintiff's amended alleged onset date, T. 44, a brain MRI showed ongoing findings of a Chiari I malformation, with somewhat greater tonsillar descent and somewhat more crowding at the craniocervical junction, and otherwise unchanged results compared to the 2014 study. T. 438.

In a general physical with Dr. Laurri on August 5, 2019, Plaintiff reported feeling like her right leg was giving out on her. T. 653. On examination, Plaintiff had weakness in flexion and extension of the right knee and mild foot drop, with a tingling and numbness sensation of the foot reproduced during compression of the knee; other musculoskeletal and neurological findings were normal, including a normal gait, normal muscle tone and bulk, and no focal neurological deficits. T. 655. Dr. Laurri noted that Plaintiff was pending an MRI and referred her for an electromyography (EMG). T. 657.

A cervical MRI on August 22, 2019, showed some mild progression in disc findings compared to the 2014 MRI, some additional mild disc bulging, and a Chiari 1 malformation with no gross changes compared to 2014. T. 444.  In follow-up at UBNS in September 2019, Plaintiff indicated that she was currently working. T. 970. NP Cuddahee noted that he had previously seen Plaintiff in 2014, when she had a known Chiari malformation and "was really minimally symptomatic." T. 447. Plaintiff was now reporting a worsening of her symptoms, predominantly headaches, as well as feeling unsteady and with legs that "feel like jelly" and significant dizziness, regarding which Plaintiff "is unable to further elaborate on that, whether it is positional or any exacerbating or alleviating factors." T. 447. Plaintiff reported neck pain with occasional sporadic numbness and tingling in the arms and legs. T. 447. NP Cuddahee recommended that Plaintiff undergo a Chiari decompression procedure. T. 448.

Medical visits through mid-December 2019 focused on Plaintiff's tonsillectomy and then craniotomy procedures. See T. 360-63, 457-96, 742-49. She was admitted for the craniotomy from December 10 to 12, 2019. T. 461.

At UBNS on March 9, 2020, Plaintiff discussed that she now had one day a week of "significant pain," that her baseline headaches had much improved since the procedure, and that she was "feeling very well." T. 497. She reported improvements in her activity level and that she was able to take better care of her kids. T. 497. NP Cuddahee noted that Plaintiff had "spondylitic issues in the neck," discussed signs and symptoms to monitor that would suggest a progression, and advised that Plaintiff could return in a year or sooner if she had worsening symptoms. T. 498. Plaintiff said she experienced "some right 'sciatica'" helped by weight loss and doing yoga. T. 498. NP Cuddahee encouraged Plaintiff "to stay the course." T. 498.

At DENT on April 16, 2020, Plaintiff reported that "her headaches and migraines have increased again," an increase in neck pain, and "more dizziness symptoms and [] increased stress or anxiety." T. 794. Plaintiff had "been out of physical therapy for quite some time"; she said "[s]he would consider returning if she is able to do virtual visits." T. 794. She wanted additional trigger point injections, which DENT administered. T. 794, 796.

In a DENT visit in July 2020, Plaintiff presented as "essentially stable since her last visit." T. 531. She reported considerable improvement in some symptoms after the decompression procedure, but then a return of headaches and migraines

once or twice a week. T. 531. She reported that trigger point injections had been very helpful and requested more. T. 531. She requested another prescription for physical therapy; she had not gone yet. T. 531. She had also discontinued the medication for abortive migraine treatment due to not liking how it made her feel. T. 531. Plaintiff reported increased stress and sleeping only five to five and a half hours a night. T. 531. DENT administered trigger point injections, issued another physical therapy referral, gave Plaintiff samples of another abortive migraine medication, and discussed how increased stress and poor sleep were likely contributing to Plaintiff's symptoms. T. 533.

In a preventive visit with Dr. Laurri in August 2020, Plaintiff mentioned that she exercised sporadically and indicated that her work status was full-time employment. T. 865. Dr. Laurri noted that Plaintiff was doing well since her decompression surgery and that her migraines were stable. T. 867.

Visits at DENT, UBNS, and with Dr. Laurri through Plaintiff's disability application filing date continued with substantially similar patterns, with Plaintiff at times reporting increased symptoms while inquiring whether this could stem from her life stressors. T. 499-500, 517-30, 869-74. Plaintiff mentioned that her occupation was "Door Dash on [and] off." T. 991.

On March 31, 2021, Plaintiff followed up at UBNS for a review of updated cervical MRI results. T. 508-10. NP Cuddahee assessed that the MRI showed adequate decompression of the Chiari site and that "it is more likely to be her

cervical spine causing her current issues." Physical therapy was recommended. T. 510.

On April 15, 2021, Plaintiff attended a consultative examination with Dr. Nikita Dave. T. 541. Plaintiff reported having a Chiari malformation diagnosed in 2013 and headaches since 2010. T. 541. She did not mention her decompression procedure. T. 541. When asked to explain why she did not mention it, Plaintiff "finally admits that the headaches went away after the Chiari decompression surgery and now since a month or two have returned." T. 541. She reported experiencing headaches daily, and that they were helped tremendously by lying down in the afternoons. T. 541. Plaintiff also reported having sciatica in 2019; Dr. Dave noted that her answers were very vague regarding where the pain was, what its aggravating factors were, or what tests she had for it. T. 542. Plaintiff did say she could not walk fast and reported diffuse pain in the right thigh. T. 542. In an intake form, Plaintiff also indicated she had seizures; when asked about them she said she tended to "space out," and said she did not have a formal diagnosis but had diagnosed herself with head injuries due to a tendency to fall on occasion. T. 542. Plaintiff reported that she needed help at home.  T. 543. She reported that she drove, cooked four times a week, performed childcare six days a week, shopped twice a week, and cleaned seven times a week. T. 543. She liked television, radio, reading online media, video games, painting, and volunteering for Meals on Wheels. T. 543. After examining Plaintiff, Dr. Dave deferred to Plaintiff's doctor regarding any restrictions associated with the Chiari malformation and decompression and otherwise assessed that Plaintiff may have

7

moderate limitations in heavy lifting, carrying, and looking down for prolonged periods. T. 545.

On April 26, 2021, State agency medical consultant Dr. J. Koenig assessed that Plaintiff was capable of functions commensurate with the medium exertional level, with some environmental restrictions to account for Plaintiff's reports that her headaches could be trigged by weather changes. T. 95-97. Dr. Koenig noted evidence including that Plaintiff reported having headaches dating to 2010 that were treated by medications, imaging indicating that Plaintiff underwent a decompression for the Chiari malformation, and the results of the examination with Dr. Dave. T. 97. On July 1, State agency medical consultant Dr. C. Krist concurred in Dr. Koenig's assessment except he also restricted Plaintiff from exposure to hazards. T. 114-15. After considering additional evidence that Plaintiff was still undergoing trigger point injections and the updated MRI results, Dr. Krist assessed that, when considered together with the previous records, the evidence still warranted the same overall functional assessment. T. 115.

At UBNS on June 30, 2021, Plaintiff reported unchanged ongoing neck pain and headaches. T. 1001. She denied radicular symptoms, denied weakness or clumsiness in the arms or hands, and reported that her balance had been stable. T. 1001. She mentioned working aggressively to lose weight, including by doing yoga. T. 1001. NP Cuddahee assessed that "[t]hings seem to be quite stable at this point from both the Chiari and cervical spine standpoint. There is no concerns on her exam." T. 1001.

Plaintiff continued visits at DENT and with Dr. Laurri. *See* T. 887-951. In September 2021, Plaintiff told Dr. Laurri that she had been feeling more depressed and overwhelmed while "trying to say no to more things so she gets less [sic] time for self-care." T. 893. Plaintiff also mentioned that she did not want "anything heavy duty" for pain management "because she does a lot of driving." T. 893. In November 2021, Plaintiff was seen at DENT's pain management clinic. T. 936. She reported that trigger point injections for her symptoms provided good results. T. 936. She also reported that Tramadol helped, "but she doesn't like to take this medication." T. 936. Given that Plaintiff was "complaining of chronic severe intractable pain affecting the function with poor quality of life," the doctor discussed medical marijuana, which Plaintiff was willing to try. T. 939. In follow-up in February 2022, Plaintiff reported that medical marijuana had been helping and that overall "her pain has been well controlled with her current medication regimen." T. 928. The clinic continued the medical marijuana prescription given Plaintiff's reports that it was working very well and was "allowing her to remain active and complete activities of daily living as well as care for her children." T. 931.

In March 2022, Plaintiff reported to Dr. Laurri that she had good pain relief from medical marijuana. T. 906. In neurological follow-up later that month, Plaintiff reported being under a lot of stress recently in connection with family concerns; her husband took a trucking job, "leaving her at home with her children at least 6 days a week, which has also been very stressful on her while she is trying to go to school." T. 923.

### 2.    Plaintiff's Mental Health

On May 2, 2019, Plaintiff attended a psychotherapy session at Niagara County Department of Mental Health (Niagara). T. 603. She reported "struggles with feeling overwhelmed and difficulty managing depression and anxiety, int[e]rfering with her many roles as a mother, wife, volunteer, etc." T. 604. She also had a problem with family relationships. T. 607.  A mental status examination showed that Plaintiff was obese, had an anxious mood, animated speech, a passively negative attitude, verbalized awareness of problems but blamed them on others, fair judgment, and attention and concentration characterized by a poor attention span. T. 603. Plaintiff was well-oriented, appeared alert, had an appropriate affect, presented as neat and clean, had good eye contact, had normal memory, had normal psychomotor activity, had no evidence of conceptual disorganization, and was reflective and able to resist urges. T 603. The session focused on family-related issues. T. 612-13. Plaintiff reported that "she has a lot going on this time of year and writer and client explore stress management." T. 613. In another session later that month, Plaintiff mentioned "struggling with a lot of bad headaches" and the therapist discussed "how stress is affecting her physical health." T. 628. Plaintiff "states that she is overwhelmed and does a lot for the community but struggles to say no. . . . [She] was receptive to starting to say no to minor projects or things that aren't as consuming." T. 628.

In psychotherapy in late July 2019, Plaintiff mentioned that she "has been having trouble swallowing and increased headaches. She has already addressed

these concerns." T. 652. Plaintiff discussed that "[s]he feels overwhelmed as this is her busy season. She continues to struggle with saying no." T. 652. After Plaintiff "discussed everything she has been involved in," the therapist emphasized the importance of self-care. T. 652. Plaintiff identified that her form of self-care was painting; the therapist discussed scheduling self-care time to ensure Plaintiff engaged in it. T. 652. Sessions through October focused on Plaintiff's medical issues or concerns regarding her children and marriage, and stressors like her husband's loss of his job. T. 683, 710, 724.

In a psychotherapy session in October of 2019, Plaintiff discussed her poor situation at home with her husband and being nervous about her upcoming medical procedures. T. 38. She also mentioned that "she is doing very good professionally and keeping busy." T. 738.

In psychotherapy in December of 2019, Plaintiff reported that her neurosurgery went well. T. 766. At UBNS on December 23, Plaintiff reported "that she feels significantly better almost immediately after surgery." T 491. She reported that her headaches and nausea were gone. T. 491. Her dizziness was occasional and mild. T. 491. She also reported a better mood. T. 491.

In January of 2020, Plaintiff reported feeling much better physically. T. 779. She discussed ongoing struggles with relationships and with her children—they did not listen or help around the house. T. 779. In another therapy session in February, Plaintiff mentioned that her husband broke his toe "so she is delivering newspapers for him." T. 790. He also "doesn't help with any of the 6 children so she always has a

kid with her and feels like she gets no alone time." T. 790. In March, Plaintiff

discussed that, as usual for this time of year, she had been "really busy." T. 810. She

also shared that she "has been feeling great physically." T. 810.  In a telehealth

psychotherapy session in in April 2020, amidst the COVID-19 pandemic, Plaintiff

discussed things being "chaotic" after all six of her children had been at home for 27

days. T. 824. She reported feeling "tired and burnt out." T. 824.

In June 2020, Plaintiff discussed "stressors related to world events." T. 836.

She mentioned her efforts to "'busy' herself," by participating in the arts, creativity,

"often giving to others," and "utilizing healthy eating and physical activity." T. 836.  In

another session that month, Plaintiff discussed "feeling exhausted from her daily

responsibilities." T. 850. The therapist noted that Plaintiff tended to struggle with

setting appropriate limits for herself and her schedule. T. 850. She tended to

overschedule herself "to allow for increased feelings of productivity and validation

that she does not get in her home." T. 850. In the next session, Plaintiff discussed

stressors including dealing with her landlord and her feelings about her church, as

well as "feelings of excitement" about being able to "get back to normal" in society. T.

862-63.

In April 2021, Plaintiff attended a consultative evaluation with psychologist Dr.

Christine Ransom. T. 537. Plaintiff drove herself 15 miles to the evaluation. T. 537.

She mentioned working two hours per week for Door Dash since 2020. T. 537. She

mentioned that she was undergoing counseling, which was very helpful. T. 537. She

reported having "a very positive lifestyle. She is doing everything that she wants to

do with no interference from any symptoms." T. 537. Plaintiff mentioned that she cooked, cleaned, did laundry, shopped, managed money, drove, enjoyed spending time with friends, and enjoyed volunteering. T. 539. She liked photography, cutting wood, painting of all kinds, video games, online social media, reading, and taking care of her children. T. 539. After a mental status examination, Dr. Ransom assessed that Plaintiff had no evidence of any mental functional limitations. T. 539.

In April of 2021, State agency psychological consultant Dr. S. Bhutwala assessed that Plaintiff's mental health conditions were not severe, *i.e.*, did not interfere with basic work functions. T. 93. Dr. Bhutwala noted evidence—including Plaintiff's various reported activities, her reports during her evaluation with Dr. Ransom, and Dr. Ransom's mental status examination findings—were essentially within normal limits. T. 93. On June 30, State agency psychological consultant Dr. O. Fassler concurred in Dr. Bhutwala's assessment. T. 110.

In late-May of 2022, a Niagara counselor issued a letter stating that Plaintiff sought treatment for emotional support while involved in a family court matter regarding her ex-husband and children, and since then she continued to attend counseling "focusing on healthy relationships with herself and others while coping with toxic relationships." T. 962.

### C. The ALJ's Decision

Following the established five-step sequential evaluation to determine whether Plaintiff was disabled within the meaning of the Act, *see*, *Bowen v. City of*

*N.Y.*, 476 U.S. 467, 470-71 (1986), the ALJ found, at step one, that Plaintiff met the

insured status requirements of the Social Security Act through June 30, 2024, and

that Plaintiff had not engaged in substantial gainful activity since July 3, 2019, the

alleged onset date. T. 20-21.  At step two, the ALJ found that Plaintiff had the

medically determinable severe impairments of Chiari malformation, migraine

headaches, degenerative disc disease of the cervical and lumbar spines, obesity,

and PTSD. T. 21. The ALJ found Plaintiff did not meet or medically equal any listed

impairment under step three, T. 21-24, requiring him to proceed to step four of the

evaluation. At step four, the ALJ  assessed Plaintiff with the residual functional

capacity to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) except: she can
> never climb ladders but can occasionally climb ramps and stairs,
> balance, stoop, kneel, crouch, and crawl. Additionally, she can tolerate
> no more than occasional exposure to work environments with
> temperature extremes; humidity; vibration; concentrated pulmonary
> irritants, such as dusts, fumes, and gases; and hazards, such as
> unprotected heights and dangerous moving machinery. Lastly, she is
> also able to perform and sustain routine and repetitive tasks with no
> more than occasional interaction with coworkers, supervisors, and the
> public.

T. 29.

While finding that Plaintiff was unable to perform her past relevant work, the

ALJ found that there were jobs in significant numbers in the national economy that

Plaintiff could perform. T. 30-31. Therefore, the ALJ found that Plaintiff was not

disabled or entitled to benefits. T. 31.

### D. The Instant Action

Plaintiff commenced this action, by and through her counsel, with the filing of a complaint on June 27, 2023. Dkt. 1. Plaintiff's sole contention is that "[t]he ALJ assessed an RFC that was not based on substantial evidence after rejecting the opinions of record, relying on his lay opinion, and failing to develop the record despite the clear gap." Dkt. 8-1, p. 1. The Commissioner, on the other hand, interposed a brief in opposition to Plaintiff's motion and in support of its request for judgment on the pleadings. Dkt. 9.

## II.   APPLICABLE LAW

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the claimant is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *42 U.S.C. § 405(g)*; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed ... that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive."). "Under this 'very deferential standard of review,' 'once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.'" *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 58-59 (2d Cir. 2013) (italics omitted) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The issue is not whether substantial evidence supports the claimant's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B.*, 523 Fed.Appx. at 59 (italics omitted).

"In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d at 151 (internal quotations omitted).

**B. Legal Standard in Evaluating RFC**

The RFC need not mirror any one medical opinion. *See Tiffany L. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0677 (WBC), 2021 WL 3145694, at *4 (W.D.N.Y. July 26, 2021) (citing *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020)); *see also Jennifer O. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1474 (WBC), 2022 WL 2718510, at *4 (W.D.N.Y. July 13, 2022) ("[A]n RFC determination, even one containing highly specific limitations, is not fatally flawed merely because it was

formulated absent a medical opinion.").  "Instead, the ALJ is 'entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.' " *Emmett K. v. Comm'r of Soc. Sec.,* No. 23-CV-6036-FPG, 2024 WL 445504, at *2 (W.D.N.Y. Feb. 6, 2024) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).  Specific limitations which are part of an RFC, "like the RFC as a whole, 'must be based on evidence in the record, not on an ALJ's own surmise.'" *Alexander P. v. Comm'r of Soc. Sec.*, No. 24-CV-145-FPG, 2025 WL 2978772, at *2 (W.D.N.Y. Oct. 22, 2025)(quoting *Wouters v. Comm'r of Soc. Sec.*, No. 19-CV-610, 2020 WL 2213896, at *2 (W.D.N.Y. May 7, 2020)).

## III.    ANALYSIS

### A.  The ALJ's Determination Is Supported By Substantial Evidence

Plaintiff argues that the ALJ erred in assessing an RFC that was not based on substantial evidence, since, in assessing Plaintiff's physical and mental limitations, the ALJ improperly relied upon his own lay opinion rather than on the opinions of medical professionals.  Dkt. 8-1, p. 11.  Plaintiff further faults the ALJ for "fail[ing] to develop the record for any additional opinion evidence after the opinions of record were clearly deficient."  *Id*.  Such contention lacks merit.

As the ALJ correctly considered, no medical opinion supported Plaintiff's claim that she suffers from a disability which precludes her from all work. T. 28-29. In that regard, consultative examiners Dr. Ransom and Dr. Dave, and State agency medical and psychological consultants Dr. Bhutwala, Dr. Koenig, Dr. Fassler, and Dr. Krist, all assessed that Plaintiff was capable of functions congruent with at least some light

work. T. 28-29; *see* T. 93, 97, 110, 115, 539, 545.  Indeed, the ALJ aptly noted that

noted that the record was replete with Plaintiff's comments indicating that her

demanding activities included being the primary caregiver for six children, working

part-time, taking online courses, artistic pursuits like painting or woodworking, and

volunteering. T. 20, 22-23, 25, 27; *see* T. 46-48, 332, 421, 427, 539, 543, 586, 604,

779, 790, 824, 913.  Despite Plaintiff's contention that the ALJ's RFC finding is not

supported by sufficiently direct and specific medical opinions, the simple fact is that

Plaintiff has not cited—nor has the Court discovered—any medical opinion evidence

in the record which supports Plaintiff's contention that a more restrictive RFC is

warranted. Plaintiff cannot merely insist that all the evidence supporting the ALJ's

RFC finding is never sufficient; rather Plaintiff "had a duty to prove a more restrictive

RFC." *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018).  Here, the Court finds

that the RFC developed by the RFC was supported by a plethora of evidence,

including objective records, medical opinions, and Plaintiff's own reported activities

of daily living.

To the extent the ALJ's RFC finding does not directly correspond to the

medical opinions in the record, the Court notes that it is actually more restrictive than

any of those opinions. Indeed, "remand is generally not warranted where the ALJ's

RFC finding is more restrictive than the limitations set forth in the medical opinions

of record, inasmuch as any alleged error in this regard inures to the claimant's

benefit." *Baker v. Berryhill*, No. 15-CV-943, 2018 WL 1173782, at *4 (W.D.N.Y. March

6, 2018).  While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden

was to show that no reasonable mind could have agreed with the ALJ's conclusions. *See Smith v. Berryhill*, 740 F. App'x at 726 ("Smith had a duty to prove a more restrictive RFC and failed to do so."). Plaintiff has failed to make such a showing.

Because the ALJ was "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole," *Matta v. Astrue*, 508 F. App'x at 56, and because the ALJ did just that, the ALJ's RFC determination was supported by substantial evidence, and this Court will not second guess it.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 8) is **DENIED** and the Commissioner's motion for judgment on the pleadings (Dkt. 9) is **GRANTED**. Plaintiff's complaint is **DISMISSED** in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED**.

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated: February 4, 2026
    Buffalo, New York